## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| _____ )  | |
| **TOMMIE JEFFERSON** ) | |
| **221 O'Brien Road** ) | |
| **Richmond, VA 23227,** ) | |
| ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **LLOYD AUSTIN,   Secretary,** ) | |
| **UNITED STATES DEPARTMENT OF** ) | |
| **DEFENSE** ) | |
| **1000 Defense Pentagon** ) | |
| **Washington, DC 20301-1000,** ) | |
| ) | |
| **Defendant.** ) | |
| _____) | |

### COMPLAINT
(Disability Discrimination and Retaliation)

### I.    INTRODUCTION/ PRELIMINARY STATEMENT

**1.**    Plaintiff Tommie Jefferson ("Mr. Jefferson") hereby files this Complaint against the Secretary of the Department of Defense, for the acts of the component Defense Intelligence  Agency ("DIA"), alleging disability discrimination and retaliation, in firing, failing to accommodate and then firing him.

### II.    PARTIES

**2.**    Plaintiff Tommie Jefferson ("Mr. Jefferson")1 entered on duty at the Overseas Allowance Team in Washington, D.C., in January 2016 as a GS-11 HR Specialist. (ROI 310-311.)

1

3.      Mr. Jefferson is diagnosed (ROI 325) as dyslexic, obese and as a diabetic.

4.      The Defense Intelligence Agency, Department of Defense, is an Agency within the Department of Homeland Security ("Defendant"),

5.      Defendant Lloyd Austin is the Secretary of the Department of Defense and is sued in his official capacity only.

## III.    JURISDICTION AND VENUE

6.      The Court has jurisdiction of this matter pursuant to 42 U.S.C. § 2000 et. seq and 28 U.S.C. 1331, 1343(a).

7.      Venue is proper in the District of Columbia, because this case arises out of discrimination and reprisal committed by Defendant with respect to Plaintiff's employment and applications for employment in this District.

## III.      EXHAUSTION OF ADMINISTRATIVE REMEDIES

8.      Mr. Jefferson protested his treatment through EEO counselor contacts.

9.      Mr. Jefferson filed formal complaints of discrimination with the Department's EEO office and has at all times been actively pursuing his claims for the years since.

10.      An EEOC administrative judge issued a decision provisionally granting summary judgment to the Agency, on November 29, 2020. Ex. 1 hereto.

11.      29 C.F.R. § 1614.110(a) states that a final agency order "shall contain notice of the complainant's right to appeal to the Equal Employment Opportunity Commission, the right to file a civil action in federal district court, the name of the

2

proper defendant in any such lawsuit and the applicable time limits for appeals and lawsuits." *Staropoli v. Donahoe*, 786 F. Supp. 2d 384, 390 (D.D.C. 2011).

12.    AJ decisions that become final agency actions by operation of law also must provide comparable notices in order to trigger the applicable statutes of limitations for appeals and civil lawsuits. *Staropoli v. Donahoe*, 786 F. Supp. 2d 384, 390 (D.D.C. 2011).

13.    The administrative judge's decision in this case did not provide Mr. Jefferson with any suit-filing notice rights. Ex. 1.

14.    The Notice provided by the AJ also indicated that Mr. Jefferson could file an administrative appeal "at any time" after the 40-day agency review period.  Ex. 1; See *Staropoli v. Donahoe*, 786 F. Supp. 2d at 390.

15.    The Defendant's EEO office has not subsequently issued a Final Agency Decision.

16.    The inadequate notice was a cause of confusion that led to a brief delay in filing of this suit.

17.    The D.C. Circuit has held that a Final Agency Decision issued without notice or with defective notice does not trigger the ordinarily applicable statute of limitations period for filing a civil suit under Title VII. *Staropoli v. Donahoe*, 786 F. Supp. 2d 384, 393 (D.D.C. 2011), *citing Wilson v. Pena*, 79 F.3d 154, 163 (D.C. Cir. 1996) ("[T]he EEOC's failure to apprise [the plaintiff] of the correct limitations period means that the period never began to run."); *Williams v. Hidalgo*, 663 F.2d 183, 188 (D.C. Cir.

1980) ("[The plaintiff] never received proper notice, and therefore the thirty-day period has never begun").

18.    Considering the above-described facts, the doctrine of equitable tolling is also applicable.

19.    Well more than 180 days have passed since Mr. Jefferson filed his formal complaint; Jefferson is free to file his lawsuit. 29 CFR § 1614.407(d).

20.    Therefore, as to all matters alleged herein, Mr. Jefferson is now free to exercise his private right of action in the U.S. District Court and to obtain a trial *de novo* pursuant to 42 U.S.C. 2000e-16(c).

### IV.    FACTS PERTAINING TO THE UNLAWFUL ACTIONS

**A. Mr. Jefferson's Duties and Supervisors; Jefferson Enters on Duty; Gottschall Admits Jefferson's Performance was not Below Standard and Demonstrates his Need for Dyslexia Accommodations; Jefferson is a Qualified Person With Disabilities, as Defendant's Managers Know; Jefferson Requests "Four-Tens" for Diabetes- Related Medical Appointments**

21.    Mr. Jefferson is a person with impairments of diabetes and obesity, which impair his major bodily function of the endocrine system and his major life activities of eating, caring for himself, thinking, communicating, and learning.

22.    Mr. Jefferson is also a person with dyslexia, a neurological disorder that impairs the major bodily function of his neurological system, and interferes with his ability to process language, and therefore his major life activities reading and learning.

23.    Mr. Jefferson's duties within Human Resources consisted of 65-75% answering HR- related emails, and 20% phone interactions.

24.     Alicia Gottschall ("Gottschall") was the rater of the ChavereS/OA team and Mr. Jefferson's first-line supervisor, while Kelly Sanborn ("Sanborn") was a reviewer and second-line supervisor.

25.     Kristy Thomas ("Thomas") supervised Sanborn.

26.     Mr. Jefferson informed Ms. Gottschall of his dyslexia, which impeded his spelling and verb tense, the diagnosis and need for reasonable accommodation.

27.     An accommodation was officially granted on February 19, 2016, of voice recognition and screen reader software.

28.      It is undisputed that at the relevant times, Mr. Jefferson was a qualified person with a disability.

29.     Mr. Jefferson's performance was not below standard.

**B. Mr. Jefferson Invokes AWS RA Process in January 2016 and Meets With Colby Dillard; Defendant Knew Jefferson was a Person With a Disability Seeking AWS; Attendance Guidelines are Addressed on February 23**

30.     Mr. Jefferson met with Colby Dillard ("Dillard") of the Equal Opportunity "EO" office on January 28, 2016, to seek an alternative work schedule as a reasonable accommodation.

31.     Obesity and diabetes caused Mr. Jefferson's AWS request.

32.     On January 28, 2016, Ms. Dillard emailed Mr. Jefferson about the reasonable accommodation process that day.

33.     Dillard deemed Mr. Jefferson a qualified individual with a disability.

**C. Dyslexia Accommodations are Requested and Granted by EO, but Gottschall Personally Adds Requirement of no Spelling/Grammatical Errors, Despite Knowing That she was not Supposed to do so, and Downgrades Mr. Jefferson's Appraisal**

34.     On February 1, 2016, Mr. Jefferson submitted his reasonable accommodation request pertaining to his learning disabilities.

35.     That request was granted on February 19 by the EO RA office.

**D. Gottschall Implements Attendance Memo Without Requirement to Email Upon Every Arrival or Departure**

36.     On February 23, 2016, Ms. Gottschall met with Mr. Jefferson and her other staff.

37.     Ms. Gottschall wrote a memo on attendance though it was never provided to Mr. Jefferson.

38.     The document notes in pertinent part that no one can begin work before 6:00, there is no need to contact Gottschall for lateness unless more than 15 minutes late, and staff must take a thirty-minute lunch.

39.     The memo conspicuously fails to mention any alleged requirement to email upon every arrival or departure.

**E. Defendant Toughens Mr. Jefferson's Performance Objectives**

40.     On March 22, 2016, just one month after Mr. Jefferson's accommodation request was submitted and granted, the Agency changed his performance objective to include: "[c]ommunications are free of spelling & grammatical errors" as a performance objective, though it was not so imposed on his peers.

41.     Through (EEOC administrative litigation) Agency Admission No. 11, Ms. Gottschall admits she personally decided to add this requirement despite knowing that she was not supposed to do so.

> F. **Despite Provision in its Handbook, Defendant Refuses Mr. Jefferson's Requests for Four-Tens as Reasonable Accommodation, Though Others are Allowed That Scheduling**

42.     Mr. Jefferson informed his supervisors of the importance of his medical appointments.

43.     Mr. Jefferson sought an Alternative Work Schedule ("AWS") right from his start date.

44.     AWS is available under the Ms. Agency's policies and allows for a set day off every week.

45.     Despite (provision in the Agency's handbook for allowing them, on various occasions Mr. Jefferson was denied the weekly set day off, referred to hereinafter as "the four- tens."

46.     Mr. Jefferson was stalled, told it would take time, told it required additional authorization and that management was trying to get it approved.

47.     Finally, Mr. Jefferson was told "we don't do four-tens."

48.     However, Mr. Jefferson's physician told him this wasn't good enough, because he was in a program that required him to attend regular appointments to monitor his sugars and medications.

49.     A day off every other week was insufficient, whereas a regular day every week was satisfactory to meet the medical need.

50.     Other Agency employees received four-tens, even without a disability.

### G. Sanborn Berates Mr. Jefferson About Dyslexia-Related Writing Errors in April 2016

51.     Around April 2016, still shortly after his accommodation requests, Ms. Sanborn began sending Mr. Jefferson emails correcting his grammar and verb tense, notwithstanding similar errors in other employees' emails that went unaddressed.

52.     Despite not being Mr. Jefferson's direct supervisor, Sanborn called a meeting with him that month, whereupon she said he was falling short on his writing.

53.     Despite being aware of the dyslexia-related accommodations he had already been granted, Sanborn was extremely hostile, as she berated Mr. Jefferson on his use of verb tense and minor missed spellings on which he had already been corrected by Ms. Gottschall.

54.     No mention was made of any time or attendance issues in the April 2016 meeting.

### H. Gottschall Receives Mr. Jefferson's Medical Schedule Accommodation in March; Management Confers on Jefferson's AWS Request

55.     In March 2016, direct supervisor Ms. Gottschall received Mr. Jefferson's March 6 request for an AWS via the Agency's "My HR" system.

56.     Mr. Jefferson told Ms. Gottschall that the AWS request was due to his need for medical appointments stemming from his medical conditions.

8

57. Because Ms. Gottschall denied four-tens and was hostile, Mr. Jefferson placed his written request for AWS in the system without specifying four-tens.

58. Ms. Gottschall admits discussing Mr. Jefferson's four-tens request with Sanborn, though Gottschall later changes her story.

> I. **April 2016 Correspondence Demonstrates Management Concerns of Arrival and Departure Emails, and Writing Errors; Neither Timecard or Timeclock Fraud, nor Lunch Breaks are Ever Mentioned**

59. On April 2, 2016, Ms. Gottschall emailed Mr. Jefferson, in part asking him to provide emails indicating his arrival and departure dates during the last week of March.

60. On April 5, Ms. Gottschall emailed a memo containing some of the February 23 requirements to the entire staff, including Mr. Jefferson.

61. It also added for the first time that they were required to email Ms. Gottschall upon arriving and departing *for the day* or if approved for CT/OT.

62. This email also did not contain a requirement of emailing upon leaving or returning to the desk *during the day*.

63. On April 6, 2016, Ms. Gottschall emailed Mr. Jefferson personally, instructing him to provide emails indicating his arrival and departure times. Jefferson complied on April 7, 2016.

> J. **Mr. Jefferson's Medication is Switched, and Requires Weekly Monitoring; Knowledge of AWS Request by 4/19, Before Badge Records First Pulled**

64.    Mr. Jefferson's diabetes medication was switched from a pill to an insulin injection.

65.    This required weekly monitoring at the VA.

66.    Without a day off each week, he could not go to his doctor to be properly monitored; Mr. Jefferson explained this to <s/ Dillard.

67.    By March, Ms. Gottschall had known Mr. Jefferson was requesting four-tens for medical reasons.

68.    On or just before April 19, 2016, Mr. Jefferson directly requested four-tens from Ms. Gottschall.

69.    Ms. Gottschall told Mr. Jefferson the four-tens request would be denied.

### K.  Protected Submission, and 4/25 Withdrawal of AWS Request

70.    On April 25, 2016, Mr. Jefferson renewed his request for four-tens through the EO office and CD.

### L.  Defendant Exploits its own Imprecise Timekeeping Requirements and Methods Against Mr. Jefferson, but not Comparator LP

71.    Defendant had no "timeclocks" present, nor was Mr. Jefferson instructed that he had to keep track of his time to the minute.

72.    Defendant had no policy for whether bathroom breaks were or were not work time.

73.    Defendant had no policy requiring the keeping of a record of the exact minutes of work, much less arrival and departure.

74.     Under Defendant's policies, if any employee was less than fifteen minutes late, informing the supervisor was specifically not required. ADP-160.

75.     Defendant's timesheet has no space for indicating in and out times.

76.     Ms. Sanborn admits she is unable to identify Jefferson's having arrived to work late by viewing a timesheet.

77.     Ms. Gottschall and Sanborn knew that Jefferson was typically eating lunch at his desk and not breaking from work but did nothing about it because it benefitted their objective of getting the work done.

78.     Yet, in analyzing Mr. Jefferson's timesheets, a five-minute discrepancy nonetheless resulted in a fifteen-minute deduction and now a charge of timecard fraud, despite the rule not requiring supervisory notification.

79.     Similarly, Defendant professed a rule prohibiting beginning work (or badging in) before 6:00 AM.

80.     In this context, Mr. Jefferson would bring his lunch and work through lunch, eating a snack and continuing to work to get the job done.

81.     Ms. Gottschall and Ms. Sanborn would have known this, and though they didn't work in an immediately adjacent area, could have known that he was eating lunch and working at the same time, with his headphones on and Ginger and screen readers working.

82.     Mr. Jefferson was never once interrupted while working through lunch or counseled that it was wrong.

83.     Comparator LP's badge records and timesheets were also reviewed, and Defendant found discrepancies.

84.     However, despite discrepancies between his badge records and time sheets, unlike Mr. Jefferson, LP was not punished.

85.     Defendant admits no one else has been terminated from the unit, and has no evidence LP ever sought reasonable accommodation or alleged Agency discrimination.

### M. Defendant Fabricates Attendance Rules to Apply Uniquely Against Jefferson, After he Seeks Reasonable Accommodations

86.     On May 2, 2016, Ms. Thomas pulled Mr. Jefferson's badge records from DIA police - for 3/31 to 4/29/2016.

87.     Thomas engaged in an alleged process of calculating the hours Jefferson had reported on timesheets without actually working.

88.     Ms. Thomas rounded down and counted against Jefferson as a full quarter-hour, even a very minimal time.

89.     Defendant has no written documentation to support a rule that reported hours must be rounded down.

90.     Ms. Thomas's calculations did not even require the mandatory lunch period, which demonstrated that she had virtually no experience with performing this type of calculation, thereby begging the question of why Defendant was doing this to Mr. Jefferson.

91.    In counting comparator LP's hours, Defendant did not round down their hours or dock LP for a mandatory unpaid lunch period.

### N.  Mr. Jefferson is Confronted on iPod in the Conference Room on May 6, 2016

92.    Shortly before May 6, 2016, Mr. Jefferson continued seeking the regular day off, emailing Ms. Gottschall while mentioning both medical appointments, his children's medical appointments and his extra-long commute from Richmond.

93.    Although he had possessed the iPod in the Conference Room for months and had approval to have it, on May 6, 2016, Ms. Gottschall admits that she and Sanborn together interrogated Jefferson about his iPod.

94.    They asked him if it was approved, insinuating that it was not.

95.    Tellingly, they asked him if it was part of his reasonable accommodation.

96.    Ms. Sanborn admits initiating this issue.

### O.  Jefferson Alleging Gottschall Discrimination to the EO Office on 5/10

97.    On May 10, 2016, Mr. Jefferson wrote a "Grievance complaint; discrimination; harassment; retaliation" to Jillian Carilli of the EO Office, alleging Ms. Gottschall and Ms. Sanborn were discriminating and retaliating against him by the addition of the "error-free" requirement and over-scrutinization of his emails.

98.    He added that the May 6 iPod event was the last straw, noting that he was asked: "was the iPod a part" of his reasonable accommodation.

**P. Mr. Jefferson Presents May 13 Medical Information Jefferson Calls Upon EO to "Re-Engage" his Reasonable Accommodations, on May 16, 2016, and Meeting is Scheduled With Ms. Gottschall**

99.     On May 13, 2016, Mr. Jefferson presented a doctor's note, which he used in support of his renewed RAR of four-tens.

100.    Ms. Dillard admitted to Jefferson that the May 13 correspondence was enough medical documentation to support his four-tens schedule request.

101.    Ms. Gottschall admits she believes that a four-ten schedule was feasible for the employees that were in the OA team carrying out the duties she supervised because employees back one another up when they're out, but she did not support Mr. Jefferson's.

102.    Beginning May 15, Mr. Jefferson was on a compressed work schedule of nine hours per day on 8 days and 8 hours on a ninth, within each pay period. ROI-76.

103.    On May 16, 2016, Mr. Jefferson informed Ms. Dillard that he was seeking to add to his reasonable accommodation and sought to "re-engage" the IAP process.

104.    Ms. Dillard set up a meeting that occurred on May 19, which Ms. Gottschall attended.

**Q. 5/19 AWS Meeting; Mr. Jefferson Requests Accommodation for Medical Appointments While Also Alleging Discrimination for Being Dyslexic**

105.    The EEO office set up a reasonable accommodation interactive accommodation process meeting for May 19, 2016, 10:30 am, on another floor.

106.    The "purpose" was to discuss Mr. Jefferson's request of four-tens

14

107.     Participants were Mr. Jefferson, Ms. Gottschall, Ms. Dillard (EEO), and Ms. Donna Harris (EEO).

108.     Ms. Dillard admitted to Jefferson that his documentation was sufficient.

109.     Ms. Harris's memo pertaining to the meeting on the "Interactive Accommodation Process" begins:

> "Colby [Dillard] started the meeting with introductions and explaining the purpose of the meeting, to discuss Mr. Mr. Jefferson's request for participation in the civilian fitness program (CFPP and possible AWS 6, 4-10 hour days. She stated that he is a qualified individual with a disability. . . The meeting concluded with all in agreement that Ms. Gottschall and Colby will both find out about the schedule of 4-10 hour days and will draft the letter for the accommodation that is being adjusted."

110.     The Managers ultimately rejected the four-tens request, and instead approved an RDO- day off every two weeks, which they knew was not really sufficient.

111.     In the meeting, there was no question they were discussing four-tens. Ms. Gottschall falsely stated that four-tens was against Defendant's policy, and became hostile, saying: "even I don't get four-tens."

112.     Mr. Jefferson reminded Ms. Gottschall that he was supposed to have a reasonable accommodation for being dyslexic, and that the standards Gottschall personally imposed were discriminatory for being contrary to that.

113.     Ms. Gottschall responded defensively, saying the requirement wasn't intentionally discriminatory and that it was a statement used for all employees that she didn't realize went against Mr. Jefferson's ability.

114.    This wasn't first time Jefferson brought this up to her, and he felt she was lying.

115.    The meeting concluded with Ms. Gottschall saying she would speak to Heather Horsley ("Horsley") and Mr. Chavere about the four-tens.

116.    Ms. Gottschall agreed to change the performance standards, but only grudgingly.

117.    She also said a regular day off would be allowed, and Jefferson was approved for fitness program.

118.    However, her body language was she was just not happy to be there or defend her decision; Gottschall was looking at her watch and gave Jefferson a condescending look of disbelief that he was so wasting her time, and to communicate he was insufficiently grateful.

### R. Managers Conduct Post- 5/19 Meetings Commingling RA Denial and Firing Mr. Jefferson, Before June 2

119.    Ms. Sanborn met with Conway once in the May 19 aftermath.

120.    In that meeting, managers (discussed both reasonable accommodation and the "timecard" issue.

121.    Sanborn admits she and Ms. Gottschall knew Mr. Jefferson was pursuing medically-related AWS when the decision to terminate him was made. Sanborn remembers there was an email regarding termination generated at the conclusion of that meeting.

122.    Mr. Chavere admits Ms. Gottschall and Ms. Sanborn initiated the firing of Mr. Jefferson.

16

123.    Ms. Sanborn says she, Ms. Thomas and Ms. Gottschall had a conversation regarding termination, including cooperating on Sanborn's draft firing notice.

124.    However, Ms. Gottschall says Ms. Horsley initiated the firing

125.    Ms. Gotschall says she knew nothing of Mr. Jefferson's disability, AWS or request for accommodation.

126.    That's another falsity, however, since as noted above, Ms. Gottschall informed Mr. Chavere and Ms. Horsley that the AWS request was related to medical condition.

### S.  Ms. Gottschall Begins Preparing Jefferson's Termination in Late May While the Four- Tens Accommodation is Under Request; By June 2, the Firing Process is Initiated; Management Opens Internal Termination "Case" Ms. against Mr. Jefferson on June 9

127.     Some time after May 28, 2016, Ms. Horsley wrote up a recommendation to fire Mr. Jefferson for alleged timecard fraud occurring up to and including May 28.

128.    It is undisputed Mr. Jefferson was never confronted with any alleged facts that might constitute timecard fraud or allowed to explain any alleged discrepancies.

129.    According to their supervisor Mr.  Chavere, Ms. Gottschall and Ms. Sanborn initiated the firing, which Sanborn admits was in June.

130.    Ms. Sanborn admits she and Ms. Gottschall knew Jefferson was seeking medically-related AWS when decision to terminate him was made.

131.     As Ms. Gottschall and Ms. Sanborn admit, by June 2, the Ms. Agency — Ms. Horsley and Mr. Chavere — was moving forward with firing Mr. Jefferson.

17

### T. June 24 Termination Draft is Developed to Fire Mr. Jefferson for Performance, not Timecards

132.    A June 24 draft "termination request" was prepared with Mr. Jefferson's performance as an issue and no indication that "timecard fraud" was.

133.    Mr. Chavere denies being consulted or any involvement in the termination.

134.    Mr. Chavere denies ever hearing of the alleged disparity between Mr. Jefferson's badge records and timesheets.

135.    Contradictorily, Mr. Chavere admits assisting Ms. Gottschall with preparing a termination based upon "time and attendance" and "not performing up to par[,]" which he says "frustrated" Gottschall.

### U. Jefferson's Requested Accommodation is Denied and the July 25 Termination Process is Issued

136.    On July 5, 2016, the requested accommodation was formally denied without a written explanation.

137.    A firing letter was issued dated July 25, 2016. It bases the firing solely upon conduct, not performance.

138.    The charges are levied: (1) unscheduled and unapproved work schedule changes, allegedly often effected without advance notice, (2) recording and receiving pay for 29.5 hours' time in which he was allegedly not at work, which characterizes as "dishonesty" the time recording Defendant characterized previously as "nominal"; and (3) ascribing the errors to lack of knowledge regarding "schedule flexibilities."

139.    Of particular interest, the notes indicate that employees are to take a 30-minute unpaid lunch, but that was not communicated to Mr. Jefferson at that time.

140.    Notably, violation of that particular rule was not cited in the firing letter.

141.    The firing package contained supporting materials including the timecard reports and the badge swipes.

142.    Ms. Horsley admits at least one entry was inaccurate.

143.    Ms. Gottschall also admits at least part of the package was inaccurate.

### V.  Conway Admits the Approximately 30 Hours" is "Nominal"

144.    EMR's Conway wrote the IG's office on June 23 regarding Mr. Jefferson:

I have a situation involving an OHR employee where the supervisor feels the employee was inaccurately recording his timecards. The number of hours the supervisor found was nominal in terms of what you may usually see (approx .. 30 hours according to badge swipes and timecard records). Would IG be interested in reviewing this matter?

### W. The Managers Understood Temporary Badges, but Gottschall Admits Defendant Treated Jefferson's Time Working With a Temporary Badge as Unapproved Absence, While Declining to Confront Mr. Jefferson Regarding Badge Records; Horsley Understood Temporary Badge Records, but Refused to Review Mr. Jefferson's

145.    Defendant fired Mr. Jefferson for attendance violations occurring when he was actually present at work on a temporary badge.

146.    Ms. Gottschall admits understanding that during some of the hours alleged as "timecard fraud", Mr. Jefferson did not appear as having badged in because he was using a temporary badge.

147.    Ms. Gottschall says that Ms. Horsley should have but did not consider the temporary badge records in Jefferson's case.

148.    Ms. Thomas admits that, contrary to her firing calculations of 8 hours' time-stealing on February 23, 2016, Mr. Jefferson that day was in the office working 8 hours ten minutes.

149.    This was on account of a temporary badge and should have been simple for her to calculate.

150.    Indeed, upon friendly questioning by her lawyer, Ms. Sanborn essentially admits that the only issues brought to Mr. Jefferson's attention were with the arrival and departure emails, not the alleged misreporting of hours or "timecard fraud."

**X.  Defendant Fabricates the Defamatory lie That Mr. Jefferson Stole 29.5 Allegedly Hours and Propagates Other Falsities in the Firing Letter**

151.    Defendant claims to have compared Mr. Jefferson's badge record to his timesheets, resulting in a conclusion of stolen time warranting firing.

152.    Close examination reveals nothing of the sort.

153.    Mr. Jefferson's alleged 29.5 or 32 hours of "time-stealing" also allegedly includes 8 hours on February 23, 2016, when—as discussed above-- he was indisputedly working.

154.    On February 25, 2016, Mr. Jefferson's badge records indicate Jefferson was in the building for 8 hours and 25 minutes; His timesheet reflects 8 hours' work such that with the mandatory implied thirty-minute lunch Jefferson was only short 5 minutes.

155.     Yet, Ms. Thomas rounded down and deducted .25 hours—three times the deficiency--, in allegedly finding 29.5 hours for firing.

156.     Badge records also reveal that on February 29, 2016, <r/ Jefferson was present for a total of 8:29 and the timesheet claims 8 hours' work.

157.     Thus, the Agency fired Mr. Jefferson in part for allegedly misrepresenting an extra quarter-hour of work time, though even assuming a 30-minute lunch deduction, he was off by just one minute.

## Y.  Comparator LP is Not Fired

158.     Ms. Gottschall admits the following: LP was, like Mr. Jefferson, on the Overseas Allowance Team, who trained Jefferson and whom Jefferson shadowed.

159.     Ms. Gottschall identified discrepancies between LP's time sheets and badge records. Gottschall admits LP was working at the same time as Jefferson.

160.     LP did not have "100% error-free" as his PO. Ms. Thomas suggested pulling LP's badge records; though LP had discrepancies between his badge records and time sheets, unlike Jefferson, LP was never confronted on those.

161.     Defendant has presented no evidence that LP ever sought reasonable accommodation or alleged he was being discriminated Ms. against, and indeed, Ms. Dillard admits implicitly that LP has no reasonable accommodation on file.

162.    Ms. Gottschall's admits LP's employment was not terminated.

## V.    STATEMENT OF CLAIMS

**COUNT I:    DISABILITY-DISCRIMINATORY FAILURE TO ACCOMMODATE MR. JEFFERSON, PRIOR TO THE MS. AGENCY'S TERMINATION, ON ACCOUNT OF HIS DISABILITIES, IN VIOLATION OF THE ADAAA, 42 U.S.C. § 12112(b)(5)(A); 42 U.S.C. 2000e-16**

163.    The ADAAA[1] and Rehabilitation Act prohibit discrimination against qualified individuals with a disability, to include failure to make "reasonable accommodations…" 42 U.S.C. § 12112(b)(5)(A).

164.    The statute further prohibits "denying employment opportunities" to avoid making reasonable accommodation," 42 U.S.C. § 12112(b)(5)(B).

165.    These provisions indisputably apply to federal employees.  29 U.S.C. § 791(f).

**166.**    Proving accommodation failure requires showings of (1) covered disability; (2) notice to the employer; (3) ability to perform the essential functions with reasonable accommodation…; and (4) employer he refusal to accommodate.[2]

167.    To be a qualified individual entitled to the Act's protections, an individual must be able to perform, with or without reasonable accommodation, the essential functions of the employment position that such individual holds or desires.

168.    To be "otherwise qualified" to perform despite a disability, Mr. Jefferson must meet applicable experience or education requirements.  29 C.F.R. § 1614.203(a)(6)(i).

[1] *See* ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553.
[2] *Rhoads v. F.D.I.C.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001) (quoted case omitted).

22

169.    He must also show that "with or without a reasonable accommodation, [he] can perform the essential functions of the position in question. . ."  29 C.F.R. § 1614.203(a)(6); *Arneson v. Sullivan*, 946 F.2d 90, 91 (8th Cir. 1991).

170.    The ADAAA specifically requires an employer to make reasonable accommodations for an employee's physical or mental limitations when the employee is otherwise qualified for the position – unless the entity can demonstrate that the accommodation would impose an undue hardship on its operations.

171.    As described above, Mr. Jefferson is a person with impairments of diabetes and obesity, which impair his major bodily function of the endocrine system and his major life activities of eating, caring for himself, thinking, communicating, and learning.

172.    Mr. Jefferson is also a person with dyslexia, a neurological disorder that impairs the major bodily function of his neurological system, and interferes with his ability to process language, and therefore his major life activities reading and learning.

173.    The Agency admits notice of Mr. Jefferson's learning disabilities including dyslexia, as well as diabetes and obesity.

174.    Further, Mr. Jefferson was qualified, since he could perform the essential functions of his position with or without accommodation.

175.    Specifically, the Defendant, through EEO staffer Ms. Colby Dillard ("CD"), admits Mr. Jefferson was covered as to diabetes and obesity, and that the Agency was required to provide reasonable accommodation in both areas absent undue burden.

176.    Defendant refused to accommodate Mr. Jefferson's disabilities with a Four-Tens schedule, and instead terminated his employment.

177.    The reasons suggested by Defendant for the failure to accommodate are pretexts intended to cover up disability discrimination and retaliation.

178.    Thus, by denying Mr. Jefferson the four-tens schedule as accommodation for his disabilities, the Defendant violated the ADAAA and the Rehabilitation Act. 42 U.S.C. § 12112(b)(5)(A); 29 U.S.C. 791 et seq..

179.    Defendant thereby caused Plaintiff Jefferson lost income and benefits, consequential and pecuniary damages, and emotional damages.

### COUNT II:    UNLAWFUL DISCRIMINATORY AND RETALIATORY TERMINATION, IN VIOLATION OF THE ADAAA, 42 U.S.C. § 12112(B)(5)(B); 42 U.S.C. 2000e-16; 29 C.F.R. §1614.101(b).

180.    Mr. Jefferson incorporates all above paragraphs by reference.

181.    A Request for reasonable accommodation is a form of protected activity.

182.    Thus, the D.C. Circuit has held in the Title VII context that "the act of requesting in good faith a reasonable accommodation is a protected activity. . ." *Solomon v. Vilsack*, 763 F.3d 1, 14 (D.C. Cir. 2014) (internal quotation marks and citations omitted); *Harris v. Chao*, 257 F. Supp. 3d 67, 89 n.27 (D.D.C. 2017).

183.    After Mr. Jefferson accused Ms. Gottschall of discrimination and further sought four-tens in the May 19, 2016 RA meeting.

184.    Pedro Chavere then gave Ms. Gottschall a writing describing how to deny the 4-10 schedule.

24

185.    Some time after May 28, 2016, Ms. Horsley wrote up a recommendation to fire Mr. Jefferson for alleged timecard fraud occurring up to and including May 28.

186.    It is undisputed Mr. Jefferson was never confronted with any alleged facts that might constitute timecard fraud or allowed to explain discrepancies.

187.    On June 2, 2016, just two weeks after the RA meeting, Ms. Thomas obtained copy of letter needed to obtain approval to terminate Mr. Jefferson.

188.    On June 7, 2016, less than three weeks after the May 19 RA meeting, Conway inquired on status of termination letter, and advised that they need to move on this instead of waiting.

189.    A termination file was opened with EMR by June 10, 2016, a June 24, 2016 draft "termination request" was prepared, and Defendant terminated Mr. Jefferson's employment, asserting pretextual reasons.

190.    By terminating Mr. Jefferson on account of disability and protected activity, the Agency violated the ADAAA and the Rehabilitation Act, as further defined in 29 C.F.R. 1614 §101(a), (b).

## VI.    REQUEST FOR RELIEF

WHEREFORE, the Plaintiff, Tommie Jefferson, prays that the Court grant him the following relief:

a. Reinstatement to a position at the GS-14 level, with full back pay and benefits.

b. Compensatory damages, in an amount to be determined by the jury in accordance with the proof at trial, for the emotional, financial and consequential harm caused by Defendant;

c.  Prejudgment and post judgment interest;

d.  Reasonable attorneys' fees, expenses and costs;

e.  Restoration of all leave used in connection to the case;

f.  Reimbursement for all expenses incurred related to the case;

g.  Posting of notices on Defendants' premises notifying employees that Defendant has violated the anti-discrimination laws, and that employees who report future violations may not be subject to retaliation, and any other equitable relief needed to preclude the Agency from committing similar violations in the future; and

h.  Such other relief as the court shall deem just and proper.

## VII.    JURY TRIAL DEMAND

The Plaintiff demands that this case be tried by a jury.

THE GOLDSMITH LAW FIRM, LLC

/s/ Leizer Z. Goldsmith

_____
Leizer Z. Goldsmith
5335 Wisconsin Avenue, NW, Suite 440
Washington, D.C. 20015
Telephone: (202) 926-3535
Facsimile: (202) 318-0798
Email: lgoldsmith@goldsmithfirm.com
Counsel for Plaintiff Tommie Jefferson