**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| TOMMIE JEFFERSON, | : | | |
| Plaintiff, | : | Civil Action No.: | 21-1489 (RC) |
| v. | : | Re Document No.: | 60, 64 |
| PETE HEGSETH, Secretary of Defense, | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION IN LIMINE

## I. INTRODUCTION

Tommie Jefferson brings claims against Pete Hegseth, in his official capacity as Secretary of Defense, for disability discrimination and retaliation in violation of the Rehabilitation Act of 1973.[1] Mr. Jefferson alleges that while he was employed by the Defense Intelligence Agency within the U.S. Department of Defense (the "Agency"), he suffered discrimination on account of his dyslexia, obesity, and diabetes, including when the Agency denied his request for an alternative work schedule as a reasonable accommodation. Mr. Jefferson was eventually terminated from his position with the Agency, purportedly because he

[1] In his complaint, Mr. Jefferson also asserted claims under Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act of 1990. *See* Compl. ¶¶ 163–90, ECF No. 1-1. Nevertheless, neither Title VII nor the ADA "prohibits disability-based discrimination against federal employees; rather, 'the Rehabilitation Act . . . is the exclusive remedy for federal employees alleging disability discrimination.'" *Richardson v. Yellen*, 167 F. Supp. 3d 105, 110 (D.D.C. 2016) (quoting *Welsh v. Hagler*, 83 F. Supp. 3d 212, 222 (D.D.C. 2015)). Furthermore, Mr. Jefferson presses no claims based on a claimed membership in any class protected by Title VII. Accordingly, to the extent Mr. Jefferson continues to assert claims under Title VII or the ADA, summary judgment is granted to Defendant on those claims.

committed significant time and attendance violations. Nevertheless, he claims that the real reasons for his termination were the Agency's anti-disability animus and/or its desire to retaliate against him for seeking a reasonable accommodation and complaining about discrimination. Currently before the Court is the Agency's motion for summary judgment. Upon careful consideration of the parties' papers, the proffered evidence, and the applicable legal standards, the Court finds that the Agency is entitled to summary judgment on Mr. Jefferson's discrimination and retaliation claims, which are premised on his termination. Nevertheless, Mr. Jefferson has met his burden to show that a reasonable jury could conclude that the Agency failed to accommodate his disability. Accordingly, the Agency's motion for summary judgment is denied as to Mr. Jefferson's failure to accommodate claim.

## II. FACTUAL BACKGROUND

From January to July 2016, Plaintiff Tommie Jefferson was employed by the Defense Intelligence Agency. Pl.'s Opp'n to Def.'s Stmt. of Mat. Facts ("Pl.'s Opp'n to SMF") ¶ 1, ECF No. 62-34.[2] Mr. Jefferson worked as a Human Resources Specialist in the Agency's Permanent

[2] The Agency argues that neither Mr. Jefferson's opposition to the Agency's statement of material facts, *see* ECF No. 62-34, nor his statement of material facts, *see* Pl.'s SMF, ECF No. 62-33, complies with Local Civil Rule 7(h). That rule requires an opposition to a motion for summary judgment to "be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated." D.D.C. Civ. R. 7(h)(1). The rule also provides that "the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." *Id.* The Court agrees that Mr. Jefferson's opposition to the Agency's statement of material facts often fails to dispute the factual assertions in the Agency's statement with record evidence. Furthermore, the Court is not pleased with Mr. Jefferson's 42-page statement of material facts, which is far from a model of concision, and which is not limited to disputed and material facts. Worse, Mr. Jefferson has effectively used these non-compliant filings to circumvent the 45-page limit for an opposition brief. *See* D.D.C. Civ. R. 47(e); Pl.'s Opp'n to Def.'s Mot. Summ. J. at 2, ECF No. 62 (instructing the Court to refer to these filings in lieu of a separate "Facts" section in his opposition brief). Under the circumstances, the Court is well within its authority to disregard Mr. Jefferson's non-compliant filings. *See, e.g.*, *Gilbert v. Napolitano*, 760 F. Supp. 2d 21, 23

Change of Station/Overseas Allowances team (the "Team"), which was housed within the Office of Human Resources. *Id.* As a Human Resources Specialist, Mr. Jefferson, along with fellow Team members, "had deadlines that had to be met to respond to tickets, or questions, ranging from just a few hours to a few days." *Id.* ¶ 3. Team members interacted with customers over email, phone, or in-person meetings in the Team's work areas, and they were expected to be present to meet customers' needs during Eastern Standard Time business hours. *Id.* ¶¶ 3, 17. At all times relevant to his complaint, Mr. Jefferson alleges that he suffered from three disabilities: dyslexia, obesity, and diabetes. *Id.* ¶ 8; Def.'s Ex. A, Dep. of Tommie Jefferson ("Jefferson Dep.") at 311–12, ECF No. 60-3.

**A. Mr. Jefferson's Reasonable Accommodation Requests**

On or around January 27, 2016, Mr. Jefferson verbally informed Alicia Gottschall, the Team lead and Mr. Jefferson's first-line supervisor, that he had a learning disability and needed special computer software to help him perform his duties. Pl.'s Opp'n to SMF ¶ 9. Shortly thereafter, Mr. Jefferson contacted the Reasonable Accommodation team within the Agency's Office of Equal Opportunity, and Colby Dillard, a Reasonable Accommodation coordinator, provided him information regarding the process for requesting an accommodation. *Id.* ¶¶ 7, 10. On January 29, Mr. Jefferson formally submitted his accommodation request to Ms. Gottschall, who then forwarded it to Equal Opportunity for processing. *Id.* ¶¶ 11–12. Equal Opportunity granted Mr. Jefferson's request on February 19, thereby providing him with two computer software programs and a headset system, with an implementation date of March 18, 2016. Pl.'s Opp'n to SMF ¶¶ 14; Def.'s Ex. A at 86, ECF No. 60-3.

---

n.1 (D.D.C. 2011), *rev'd on other grounds*, 670 F.3d 258, 263 (D.C. Cir. 2012). Nevertheless, the Court will consider these filings, including for purposes of controverting facts in the Agency's statement of material facts.

Separately, Mr. Jefferson made a verbal request to Ms. Gottschall for a "4/10" alternative work schedule, which, if granted, would have allowed him to work four ten-hour days per work week rather than five eight-hour days. Pl.'s Opp'n to SMF ¶ 16. Mr. Jefferson does not dispute that this verbal request was "unrelated to [his] request for reasonable accommodation or any medical reasons." *Id.* Ms. Gottschall denied Mr. Jefferson's 4/10 request but approved a different alternative work schedule allowing him to take off every second Thursday. *Id.* ¶ 20. The Agency maintains that Mr. Jefferson's initial 4/10 request was denied because that schedule was not available to Human Resources employees, *see id.* ¶ 18, while Mr. Jefferson states that the reason for the denial was "that [he] hadn't been with the Agency long enough," *see* Pl.'s Ex. 9, Decl. of Tommie Jefferson ("Jefferson Decl.") ¶ 11, ECF No. 62-9.

Sometime later, Mr. Jefferson again requested an alternative work schedule, but this time, he submitted a written request through the Agency's reasonable accommodation process. Pl.'s Opp'n to SMF ¶ 21; Jefferson Decl. ¶ 13. In support of this request, he submitted a letter from an endocrinologist dated May 13, 2016, stating that Mr. Jefferson was "being seen regularly for diabetes and obesity" at a Veteran Affairs ("VA") medical center and recommending that he "be allowed to have a flexible work schedule," including so that he could "attend his appointments at the VA." Def.'s Ex. A at 88.

On May 19, 2016, Mr. Jefferson met with Ms. Gottschall and members of the Reasonable Accommodation team, including Ms. Dillard and Donna Harris, to discuss his request for a reasonable accommodation in the form of an alternative work schedule. Pl.'s Opp'n to SMF ¶ 21; *see also* Pl.'s Ex. 8-5, ECF No. 62-8. Mr. Jefferson testified that although his written request did not specify that he sought a 4/10 schedule, he explained during the meeting that "the every-[other]-Thursday-off schedule would not meet [his] needs" and that he "really needed the

four-tens schedule." Jefferson Decl. ¶ 24. Ms. Gottschall testified that she learned for the first time during this meeting ("May 19 meeting") that Mr. Jefferson was requesting an alternative work schedule to attend medical appointments and that he had submitted medical documentation in support of this request. Pl.'s Ex. 8, Dep. of Alicia Gottschall ("Gottschall Dep.") at 70, 113–14, ECF No. 62-8.

As Mr. Jefferson recounts, Ms. Gottschall sought to deny his request for a 4/10 schedule during the May 19 meeting on the grounds that it was "against [Agency] policy," but Ms. Dillard informed her that she needed to consult with her supervisor, Pedro Chevere, before finalizing a decision. Jefferson Decl. ¶¶ 26–27. This is consistent with Ms. Harris's records, which note that Ms. Dillard stated that Mr. Jefferson was "a qualified individual with a disability," that Ms. Gottschall sought to deny his request as "a violation to [Agency] policy," and that Ms. Dillard then "let [Ms. Gottschall] know that this [wa]s something that ha[d] to be cleared before we c[ould] just outright deny it." Pl.'s Ex. 8-5.

After the May 19 meeting, Ms. Gottschall asked Mr. Chevere and Heather Horsley, the division chief for the employee services division, about the feasibility of granting Mr. Jefferson a 4/10 schedule. *See* Pl.'s Opp'n to SMF ¶¶ 6, 22; Pl.'s Ex. 8-6, ECF No. 62-8; Pl.'s Ex. 8, Gottschall Dep. at 83–84. According to Ms. Gottschall, she told Mr. Chevere and Ms. Horsley that Mr. Jefferson was seeking a 4/10 schedule as a reasonable accommodation and that Ms. Dillard had stated at the Reasonable Accommodation meeting that his medical documentation supported his request. Pl.'s Ex. 8, Gottschall Dep. at 86–87, 114–15. However, Mr. Chevere informed her that having Mr. Jefferson work a 4/10 schedule would not be "in [the Agency's] best interest" because it "would unbalance the workload in the team," including by limiting "his availability and accessibility to customers" and the Agency's "ability to provide timely service,"

and because it "would also delay his professional development as he would be w/o supervision/guidance at least 2 hours a day." Pl.'s Ex. 8-6.

On July 5, 2016, Plaintiff's request for a 4/10 schedule was formally denied. Pl.'s Opp'n to SMF ¶ 25; *see also* Def.'s Ex. A, Jefferson Dep. at 322–23. A few weeks earlier, his reasonable accommodation had been modified to allow him to take every second Thursday off, with an implementation date of June 20, 2016. Def.'s Ex. A at 87.

**B. Termination of Mr. Jefferson's Employment**

On July 25, 2016, Mr. Jefferson's employment with the Agency was terminated, effective July 25, 2016. *See* Pl.'s Opp'n to SMF ¶ 26; Def.'s Ex. A at 149–51. Mr. Jefferson's termination occurred during his initial two-year probationary period, during which time Agency policy allowed for an employee "to be separated at any time when it is determined the employee's conduct or performance is inappropriate," without a right to appeal. Def.'s Ex. A at 149–50. As further described below, Mr. Jefferson's termination notice informed him that he was being terminated because his "time and attendance practices" had "not met the standards expected of an employee in the Federal Government." *Id.* Nevertheless, Mr. Jefferson believes this justification is pretext for discrimination and/or retaliation.

Mr. Jefferson recounts several confrontations with his supervisors leading up to his termination. First, around April 2016, Kelly Sanborn, his second-line supervisor, began correcting his spelling and grammar in emails he sent to customers. Jefferson Decl. ¶¶ 6–7. According to Ms. Sanborn, she "notic[ed] a pattern of poor communication" in his emails, both in terms of spelling and grammar and in "misinformation on policy" given to customers. Def.'s Ex. A, Dep. of Kelly Sanborn ("Sanborn Dep.") at 374–75, ECF No. 60-3. Ms. Sanborn soon raised these issues with Ms. Gottschall, who informed her that Mr. Jefferson used special

computer software in connection with an accommodation. *Id.* at 366. However, Ms. Sanborn stated that she did not learn that Mr. Jefferson had a learning disability until around June, when Reasonable Accommodation told her that his accommodation was for "comprehension." *Id.* at 366, 378. In contrast, Mr. Jefferson declared that he brought up his "reading comprehension reasonable accommodations" with Ms. Sanborn during a meeting he had with her in April. Jefferson Decl. ¶ 8. He also claimed that at this meeting, Ms. Sanborn "berated [him] on [his] use of verb tense and minor missed spellings [*sic*]." *Id.* ¶ 7.

Second, on May 6, 2016, Mr. Jefferson was questioned about his possession of an iPod, which was a prohibited item. *See* Def.'s Ex. A, Sanborn Dep. at 380–82. Ms. Sanborn testified that after she saw an iPod sitting on Mr. Jefferson's desk, she informed Ms. Gottschall, who proceeded to confront Mr. Jefferson about it. *Id.* at 381–82. Mr. Jefferson explained, however, that the Agency's Special Security Office had given him permission to bring his iPod to work, and he produced the relevant paperwork upon request. *Id.* at 382.

A few days later, on May 10, 2026, Mr. Jefferson filed a grievance against Ms. Gottschall and Ms. Sanborn with Equal Opportunity, alleging "discrimination," "harassment," and "retaliation." *See* Jefferson Decl. ¶¶ 14–15; Pl.'s Ex. 9-1 at 1, ECF No. 62-9. Mr. Jefferson complained that although he "notified [his] supervisor of [his] disabilities and submitted paperwork for reasonable accommodation" during the first week of his employment, his performance objectives were "written against [his] disability"—in particular, a performance objective that his communications be "free of spelling & grammatical errors." Pl.'s Ex. 9-1 at 1. Although he spoke to Ms. Gottschall regarding this concern, he "was told this is a 'standard practice.'" *Id.* Mr. Jefferson further complained about "hav[ing] been continuously scrutinized in emails by Ms. Sanborn and Ms. Gottschall over [his] grammatical errors." *Id.* The "last

straw" for Mr. Jefferson occurred when he was "humiliated" by Ms. Sanborn and Ms. Gottschall over his possession of an iPod. *Id.* at 2.

Third, Mr. Jefferson clashed with various supervisors over alleged time and attendance violations. According to his termination notice, Mr. Jefferson was provided guidance on how to "accurately reflect [his] time and attendance" on several occasions, including at a training during his first week and by Ms. Gottschall at a team meeting on February 23, 2016. Def.'s Ex. A at 149–50. Ms. Gottschall's memorandum of that meeting emphasizes, among other policies, that "everyone is expected to be here and on time," "no one should be working [comp time]/ [overtime] without checking with me in advance," and "if you come in early, that does not mean you can leave early" without advance approval. Pl.'s Ex. 5 at 5, ECF No. 62-5. The record also reflects that on April 5, 2016, Ms. Gottschall circulated an email to her team, including Mr. Jefferson, reiterating these points and adding that effective "immediately," Team members were to email her daily with their arrival and departure times to help her keep track of their hours. *Id.* at 63.

Mr. Jefferson's termination notice notes that Ms. Gottschall and Ms. Sanborn had previously raised concerns with him regarding his time and attendance practices, including that he was "making unscheduled and unapproved changes to [his] work schedule often without advanced notice" and that he was inaccurately recording his hours on his timesheets. Def.'s Ex. A at 149–50. The evidence in the record reveals various incidents. For example, on March 18, 2016, Ms. Gottschall emailed Mr. Jefferson about a "discrepancy" between his timesheet for that week and his emails to her indicating his arrival and departure times. *See* Pl.'s Ex. 14-3 at 1–2, ECF No. 62-14. Mr. Jefferson replied that there was no discrepancy. *See id.* at 1. In early May, Ms. Gottschall emailed him again, asking him to explain why he had worked two hours past his

normal departure time on one day and left two hours early the next. *See* Pl.'s Ex. 5 at 51. Mr. Jefferson explained that he modified his schedule to attend a mandatory class. *Id.* at 50–51. Furthermore, on June 9, Ms. Sanborn and Ms. Gottschall met with Mr. Jefferson regarding his timesheet for the pay period ending that week. *See* Pl.'s Ex. 11 at 9, ECF No. 62-11. By that point, Mr. Jefferson had been approved to take a regular day off ("RDO") every other Thursday. According to a memorandum prepared by Ms. Sanborn, Mr. Jefferson had inaccurately reported his RDO and shown up to work on his scheduled RDO without prior approval. *Id.* Going forward, Ms. Sanborn agreed to "assist [Mr. Jefferson] . . . to correct his timesheet" and Mr. Jefferson agreed to "ask any questions regarding his timekeeping prior to entering his time." *Id.*

The parties agree that at some point, Ms. Gottschall and Ms. Sanborn conferred with Kristy Thomas, the deputy for technical services in employee relations, regarding Mr. Jefferson's work attendance and performance. Pl.'s Opp'n to SMF ¶¶ 5, 45. The record reflects that Ms. Thomas requested Mr. Jefferson's badge swipe log on at least two occasions: on March 31, 2016, *see* Pl.'s Ex. 31 at 36, ECF No. 62-31, and on May 2, 2016, *see* Pl.'s Ex. 5 at 61. Ms. Thomas conducted a review of Mr. Jefferson's timecards and badge swipe log. *See* Pl.'s Opp'n to SMF ¶ 46; Pl.'s Ex. 5 at 35–52. By comparing these records, she determined that for pay periods three to nine of that calendar year—from late January to early May 2016, roughly—Mr. Jefferson overreported his work hours on his timecards by about 29.5 hours. *See* Pl.'s Opp'n to SMF ¶ 46; Pl.'s Ex. 5 at 60; Def.'s Ex. A at 150 (informing Mr. Jefferson that "[b]ased on the badge swipes, it became evident that despite the clear guidance you had received, you were recording and receiving pay for time in which you were not at work").

Ms. Thomas submitted Mr. Jefferson's records to Sandra Conway in Employee Management Relations ("EMR"). *See* Pl.'s Opp'n to SMF ¶ 53. According to Ms. Sanborn, Ms.

Conway then conferred with her, Ms. Gottschall, Ms. Horsley, and someone from Equal Opportunity "to address the issues and concerns [the Agency] was having with Mr. Jefferson." Pl.'s Ex. 2, Dep. of Kelly Sanborn ("Sanborn Dep.") at 43–45, ECF No. 62-2; *see also* Pl.'s Opp'n to SMF ¶ 61. The group reportedly discussed Mr. Jefferson's "work performance" and "time and attendance" and contemplated termination as a possible course of action. Pl.'s Ex. 2, Sanborn Dep. at 47–48, 53. Equal Opportunity allegedly raised Mr. Jefferson's "reasonable accommodation . . . for reading comprehension" to ensure that if the Agency proceeded with termination, it would not be "encroaching upon" that accommodation. *Id.* at 53–54. But Ms. Sanborn stated that the group did not agree to anything at that point. *Id.* at 48.

Ms. Horsley, meanwhile, testified that she did not attend a meeting between Ms. Conway, Ms. Sanborn, and Equal Opportunity, but that she did meet with Ms. Conway, Mr. Chevere, Ms. Thomas, and perhaps Ms. Gottschall about possibly terminating Mr. Jefferson. *See* Pl.'s Ex. 18, Dep. of Heather Horsley ("Horsley Dep.") at 61–62, ECF No. 62-18. While Ms. Horsley also testified that she did not remember who among those individuals was the first to suggest terminating Mr. Jefferson, *see id.* at 62, Ms. Gottschall stated that it was Ms. Horsley, *see* Pl.'s Ex. 8, Gottschall Dep. at 299, and Mr. Chevere "imagine[d] that the decision had been made between [Ms. Gottschall] and Kelly Sanborn" in discussion with Ms. Horsley, *see* Pl.'s Ex. 16, Dep. of Pedro Chevere ("Chevere Dep.") at 89–90, ECF No. 62-16. Ms. Horsley stated that at the time, she was not aware of Mr. Jefferson's reasonable accommodation, medical conditions, alternative work schedule requests, or discrimination complaint. *See* Pl.'s Ex. 18, Horsley Dep. at 38, 46, 50–51. Plaintiff disputes this. *See* Pl.'s Opp'n to SMF ¶ 62.

The record reflects that by June 2, 2016, at the latest, the Agency had decided to move forward with Mr. Jefferson's termination. *See* Pl.'s Ex. 5 at 9; Pl.'s Ex. 8, Gottschall Dep. at

293. Agency policy at that time stated that for any disciplinary action "involving inappropriate on-duty conduct, a management official in the employee's supervisory chain will be the proposing official and the appropriate higher level management official is the deciding official." Def.'s Ex. A at 277; Pl.'s Opp'n to SMF ¶ 60. Ms. Horsley, who was in Mr. Jefferson's supervisory chain, was the proposing official and Steven Rush was the final deciding official on Mr. Jefferson's termination. Pl.'s Opp'n to SMF ¶¶ 6, 58–59; Pl.'s Ex. 18, Horsley Dep. at 35. Ms. Horsley testified that when she first received Mr. Jefferson's case file from EMR, she did not review his time sheets and badge swipe log or conduct an independent investigation into the alleged discrepancies between the two. *See* Pl.'s Ex. 18, Horsely Dep. at 30–31. She also stated, however, that she later reviewed these records as part of the "final package" for Mr. Jefferson's termination and verified that there were indeed discrepancies. *See* Pl.'s Ex. 18, Horsley Dep. at 31.

As the final deciding official, Mr. Rush reviewed Mr. Jefferson's case file, *see* Pl.'s Opp'n to SMF ¶ 63, including his timecards and badge swipe log and annotations thereto, but Mr. Rush testified that he did not personally tally Mr. Jefferson's hours, *see* Pl.'s Ex. 17, Dep. of Steven Rush ("Rush Dep.") at 36, ECF No. 62-17. Mr. Rush declared that he had no knowledge of Mr. Jefferson's accommodation requests or disabilities. *See* Pl.'s Opp'n to SMF ¶ 64; Pl.'s Ex. 17, Rush Dep. at 29. "After concluding that Plaintiff's performance and conduct was not up to the requisite standards, Mr. Rush ultimately signed off on Plaintiff's notice of termination, effective July 16, 2016." Pl.'s Opp'n to SMF ¶ 65.

## III. LEGAL STANDARDS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). The mere existence of some factual dispute, however, is insufficient to bar summary judgment; the dispute must both be "genuine" and pertain to a "material" fact. "A dispute is 'genuine' only if a reasonable fact-finder could find for the non-moving party; a fact is only 'material' if it is capable of affecting the outcome of the litigation." *Bonnette v. Shinseki*, 907 F. Supp. 2d 54, 67 (D.D.C. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In assessing a motion for summary judgment, "all underlying facts and inferences are analyzed in the light most favorable to the non-moving party." *Id.* at 68 (quoting *N.S. ex rel. Stein v. Dist. of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010)).

"The party seeking summary judgment bears the 'initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* at 67 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The non-movant cannot, however, avoid summary judgment by "rest[ing] upon the mere allegations or denials of its pleadings." *Id.* at 68. Rather, the non-movant must establish that a material fact is genuinely disputed by citing to particular parts of materials in the record supporting its position or else demonstrate that the materials relied upon by the opposing party do not establish the absence of a genuine dispute. *See* Fed. R. Civ. P. 56(c)(1).

## IV. ANALYSIS

"Under the standards of the Americans with Disabilities Act, incorporated by the Rehabilitation Act, federal agencies may not 'discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges

of employment.'" *Qashu v. Rubio*, 172 F.4th 28, 33 (D.C. Cir. 2026) (quoting 42 U.S.C. § 12112(a)); *see also* 29 U.S.C. § 791(f). The Rehabilitation Act "bars several different types of discrimination," including, relevant here, "failure to accommodate," "intentional discrimination, also known as 'disparate treatment' discrimination," and "retaliation." *Drasek v. Burwell*, 121 F. Supp. 3d 143, 153 (D.D.C. 2015) (citation modified). Here, Mr. Jefferson argues that the Agency violated the Rehabilitation Act by denying his request for a reasonable accommodation in the form of a 4/10 schedule and by terminating him because of his disabilities and/or in retaliation for seeking a reasonable accommodation or complaining about discrimination. *See generally* Pl.'s Opp'n, ECF No. 62. The Court addresses Mr. Jefferson's failure to accommodate, intentional discrimination, and retaliation claims in turn, and concludes that the Agency is entitled to summary judgment only on the last two claims.

### A. Failure to Accommodate

Under the Rehabilitation Act, a federal agency is required to "[make] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability,…unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A); *see also* 29 U.S.C. § 794(d); *Breen v. Dep't of Transp.*, 282 F.3d 839, 841 (D.C. Cir. 2002). To prevail on a claim for failure to accommodate, the plaintiff must demonstrate that (1) he is a qualified individual with a disability, (2) his employer had notice of his disability, and (3) his employer denied his request for a reasonable accommodation. *See Ward v. McDonald*, 762 F.3d 24, 31 (D.C. Cir. 2014). A qualified individual is someone who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

"[I]n any action premised on failure to accommodate, the plaintiff typically bears the burden of providing notice of her disability and the limitations it imposes . . . [and of] request[ing] any needed accommodation." *Faison v. Vance-Cooks*, 896 F. Supp. 2d 37, 57 (D.D.C. 2012). Once an employer has notice of an employee's disability and desire for an accommodation, "it is incumbent on the employer to make a reasonable effort to determine the appropriate accommodation." *Id.* at 62. To make this determination, "the employer may need to 'initiate an informal, interactive process with the individual with a disability in need of accommodation,' which 'process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'" *Id.* (quoting 29 C.F.R. § 1630.2(o)(3)). "Once this process has begun, both the employer and the employee have a duty to act in good faith." *McNair v. Dist. of Columbia*, 11 F. Supp. 3d 10, 16 (D.D.C. 2014) (citation modified). "A party that obstructs or delays the interactive process is not acting in good faith." *Ward*, 762 F.3d at 32 (quoting *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005)). For example, an employer can be held liable for denying an accommodation if it "end[s] the interactive process." *Cogdell v. Murphy*, No. CV 19-2462 (RC), 2020 WL 6822683, at *7 (D.D.C. Nov. 20, 2020) (quoting *Ward*, 762 F.3d at 32). But by the same token, "an employee that materially obstructs the informational exchange—for example, by withholding relevant medical information—cannot prevail on a failure-to-accommodate claim." *Ali v. Regan*, 111 F.4th 1264, 1275 (D.C. Cir. 2024).

"If the plaintiff establishes a prima facie case of failure to provide reasonable accommodation, then it is up to the employer to demonstrate that the accommodation would have imposed an undue burden on its business." *Bonnette*, 907 F. Supp. 2d at 77. "This burden is met if the employer offers an [alternative] accommodation 'that is reasonable, even if it is not

the one preferred by the employee.'" *Qashu*, 172 F.4th at 33 (quoting *Ali*, 111 F.4th at 1269). As the D.C. Circuit has explained, "an employer is not required to provide an employee that accommodation he requests or prefers, the employer need only provide some reasonable accommodation." *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1305 (D.C. Cir. 1998) (en banc) (quoting *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996)); *see also Doak v. Johnson*, 19 F. Supp. 3d 259, 274 (D.D.C. 2014).

Here, Mr. Jefferson argues that the Agency failed to provide him a reasonable accommodation for his obesity and diabetes, as required under the Rehabilitation Act, when it denied his request for a 4/10 alternative work schedule. *See* Pl.'s Opp'n at 3–4. He alleges that he needed the 4/10 schedule to attend weekly medical appointments necessary to control these medical conditions. *Id.* at 3. He also notes that he provided medical documentation to Ms. Dillard substantiating his reasonable accommodation request. *See id.* at 3–4. The Agency observes, on the other hand, that Mr. Jefferson's medical documentation did not state, whether explicitly or by implication, that Mr. Jefferson needed one day off per work week to control his medical conditions. Def.'s Mot. Summ. J. ("Def.'s Mot.") at 12–13, ECF No. 60-1. Moreover, it maintains that a 4/10 schedule would not have been a reasonable accommodation because it would have "conflicted with Agency policy and mission goals." Def.'s Mot. at 13.

The Court first addresses the Agency's purported lack of notice as to the limitations imposed by Mr. Jefferson's disability. Undisputed evidence establishes that, at least as of the May 19 meeting between Mr. Jefferson, Ms. Gottschall, and members of the Reasonable Accommodation team, the Agency knew that Mr. Jefferson was "a qualified individual with a disability," *see* Pl.'s Ex. 8-5, and that, in connection with a disability, Mr. Jefferson was requesting an alternative work schedule to attend medical appointments, *see, e.g.*, Pl.'s Ex. 8,

Gottschall Dep. at 70, 113–14. Nevertheless, "[k]nowledge of a disability is different from knowledge of the resulting limitation." *Waggel v. George Washington Univ.*, 957 F.3d 1364, 1372 (D.C. Cir. 2020) (quoting *Windham v. Harris Cty.*, 875 F.3d 229, 238 (5th Cir. 2017)). If the Agency can show that it was not aware that, due to his disability, Mr. Jefferson needed one day off per week to attend medical appointments—and that this lack of knowledge did not stem from the Agency's failure to participate in good faith in an "interactive process . . . [to] identify the precise limitations" resulting from his disability, *see Faison*, 896 F. Supp. 2d at 62 (quoting 29 C.F.R. § 1630.2(o)(3))—then the Agency cannot be faulted for rejecting Mr. Jefferson's request for a 4/10 schedule and allowing him instead one day off every two weeks. After all, "[b]efore an employer must make accommodation for the physical or mental limitation of an employee, the employer must have knowledge that such a limitation exists." *Miller v. Nat'l Cas. Co.*, 61 F.3d 627, 629 (8th Cir. 1995); *see also Waggel*, 957 F.3d at 1372 ("Notice of a disability does not ordinarily satisfy the ADA's request requirement, which performs the independent function of informing an employer of the limitations imposed by the disability and the nature of the accommodation needed to remedy those limitations.").[3]

Here, however, whether Mr. Jefferson informed the Agency of the limitations associated with his disability is a disputed material fact. It is true, as the Agency observes, that although Mr. Jefferson's letter from his endocrinologist stated that he was "being seen regularly for diabetes and obesity," it recommended only that he "be allowed a flexible work schedule" to

[3] The D.C. Circuit has recognized that "there may well be cases where the plaintiff's need for an accommodation is so apparent that the defendant must offer one regardless of whether the plaintiff requested it." *Waggel*, 957 F.3d at 1372 (quoting *Chenari v. George Washington Univ.*, 847 F.3d 740, 748 (D.C. Cir. 2017)). But the Court does not believe that this is such a case, given that the connection between Mr. Jefferson's medical conditions and his need for weekly monitoring is not obvious. Mr. Jefferson does not argue otherwise.

attend medical appointments, without referencing a need for weekly appointments. Def.'s Ex. A at 88. Nevertheless, Mr. Jefferson declares that he informed Ms. Gottschall and the Reasonable Accommodation team during the May 19 meeting that he "really needed the four-tens schedule" and that "the every-[other]-Thursday-off schedule would not meet [his] needs." Jefferson Decl. ¶ 24; Pl.'s SMF ¶ 17.

To be sure, Mr. Jefferson's declaration is not undisputed. For example, Ms. Dillard, who attended the May 19 meeting, testified that she did not recall Mr. Jefferson stating that the every-other-Thursday-off schedule was insufficient. *See* Pl.'s Ex. 6, Dep. of Colby Dillard ("Dillard Dep.") at 162, ECF No. 62-6. Furthermore, Mr. Jefferson does not declare or cite evidence showing that he told the Agency that he needed one day off per week *because* his medical conditions required weekly monitoring. Nevertheless, it is undisputed that he told the Agency that he wanted a 4/10 schedule as a reasonable accommodation to attend medical appointments. *See* Pl.'s Ex. 8, Gottschall Dep. at 70, 113–14. And at this stage, the Court must accept Mr. Jefferson's statement that he told the Agency that the every-other-Thursday-off schedule would not meet his needs. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) ("[A]s a [general] rule, statements made by the party opposing a motion for summary judgment must be accepted as true for the purpose of ruling on that motion."). Viewing this evidence in the light most favorable to Mr. Jefferson, a reasonable jury could find that, in fact, Mr. Jefferson informed the Agency of the limitations imposed by his disability—in other words, that due to his disability, he needed a flexible schedule to attend medical appointments, and that although a 4/10 schedule would accommodate that need, an every-other-Thursday-off schedule would not.

Of course, assuming Mr. Jefferson informed the Agency of these limitations, the Agency was not required to take Mr. Jefferson's statements at face value. If the need for a 4/10 schedule

as an accommodation was not "obvious" to the Agency, it could have "require[d] that [Mr. Jefferson] . . . provide documentation of the need" specifically for that schedule. *Ward*, 762 F.3d at 31–32. Had the Agency requested this information and Mr. Jefferson subsequently "materially obstruct[ed] the informational exchange," the Court would have had no issue granting summary judgment to the Agency on Mr. Jefferson's failure to accommodate claim. *Ali*, 111 F.4th at 1275. But that is not what happened. Rather, the record shows that immediately after the May 19 meeting, Ms. Gottschall conferred with her supervisor, Mr. Chevere, about Mr. Jefferson's request for a 4/10 schedule, and Mr. Chevere denied the request on the grounds that it would "unbalance the workload in the team" and "delay [Mr. Jefferson's] professional development." Pl.'s Ex. 8-6. Furthermore, the Agency cites no evidence that, having denied Mr. Jefferson's request for a 4/10 schedule, it continued an "interactive process" with Mr. Jefferson to identify the limitations resulting from his disability and an appropriate alternative accommodation. *Faison*, 896 F. Supp. 2d at 62 (quoting 29 C.F.R. § 1630.2(o)(3)). Viewing this record in the light most favorable to Mr. Jefferson, a reasonable jury might even find that the Agency improperly "ended the interactive process." *Cogdell*, 2020 WL 6822683, at *7.

Nevertheless, the Agency points out that it was not required to provide Mr. Jefferson his preferred accommodation of a 4/10 schedule, but only "*some* reasonable accommodation." *Aka*, 156 F.3d at 1305 (emphasis added); *see also* Def.'s Mot. at 12. In the Agency's view, it fulfilled this obligation when, a few weeks after denying him a 4/10 schedule, it granted him an alternative accommodation that allowed him to take off one Thursday every two weeks. *See* Def.'s Mot. at 12; Pl.'s Opp'n to SMF ¶ 25. However, the Court cannot say that this alternative accommodation was reasonable as a matter of law. A "reasonable" accommodation "must be

responsive to and tailored to a specific disability." *Coleman-Adebayo v. Leavitt*, 326 F. Supp. 2d 132, 143 (D.D.C. 2004). Assuming the Agency was aware of Mr. Jefferson's need for *weekly* appointments, a reasonable jury could find that the alternative accommodation granted to Mr. Jefferson was not tailored to his disability. Separately, the Agency also seemingly argues that it is entitled to summary judgment on Mr. Jefferson's failure to accommodate claim because a 4/10 schedule would have "imposed an undue burden" on the Agency. *Bonnette*, 907 F. Supp. 2d at 77; *see also* Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. ("Def.'s Reply") at 3–4, ECF No. 63. On this point, the Agency bears the burden of proof. *See Bonnette*, 907 F. Supp. 2d at 77. But here, too, the evidence is disputed. For example, according to Ms. Gottschall, Mr. Chevere informed her that a 4/10 schedule would unbalance the Team's workload and limit its ability to provide timely service to customers. Pl.'s Ex. 8-6. When asked about these statements, Mr. Chevere explained that "[a]ny time that an employee is not in the office and a customer comes in to see that person, someone else has to stop whatever they are doing to take care of his customer." Pl.'s Ex. 16, Chevere Dep. at 133. Nevertheless, as Mr. Jefferson points out, Ms. Gottschall conversely testified that granting an employee a 4/10 schedule would not necessarily unbalance the Team's workload, as that employee could, under that schedule, theoretically still fulfill his job duties without needing to redistribute them. *See* Pl.'s Ex. 8, Gottschall Dep. at 182–85; Pl.'s Opp'n at 4.

The Agency additionally notes that it denied Mr. Jefferson's request for a 4/10 schedule "because of an office policy disallowing Agency employees on the Team from having such an alternative work schedule." Def.'s Mot. at 12. Of course, the existence of such a policy could show that the Agency believed that a 4/10 schedule was unworkable, and it might even bear on the schedule's objective reasonableness. However, an employer must be "willing to consider

making changes in its ordinary work rules . . . in order to enable a disabled individual to work." *Faison*, 896 F. Supp. 2d at 56 (quoting *Vande Zande v. Wisconsin*, 44 F.3d 538, 542 (7th Cir. 1995)). Assuming that such a policy existed, the Court believes that a reasonable factfinder could not conclude from its existence alone that a 4/10 schedule would have imposed an undue burden on the Agency.

In sum, the Court cannot conclude, as a matter of law, either that the alternative accommodation granted to Mr. Jefferson was reasonable or that his preferred accommodation of a 4/10 schedule would have imposed an undue burden on the Agency. Accordingly, the Court denies summary judgment to the Agency on Mr. Jefferson's failure to accommodate claim.

**B. Discrimination**

The Rehabilitation Act "governs employee claims of [disability] discrimination against the Federal Government." *Montgomery v. McDonough*, 682 F. Supp. 3d 1, 14 (D.D.C. 2023) (quoting *Ward*, 762 F.3d at 28). "[B]ecause of the similarities between the Rehabilitation Act and the ADA, cases interpreting either are applicable or interchangeable." *Id.* at 14–15 (quoting *Alston v. Washington Metro. Area Transit Auth.*, 571 F. Supp. 2d 77, 81 (D.D.C. 2008)). One exception, however, is that "the Rehabilitation Act has a clear 'but-for' causation standard." *Id.* at 15. Accordingly, to prevail on a claim for disability discrimination under the Rehabilitation Act, a plaintiff must establish that (1) he was a qualified individual with a disability, (2) his employer knew of his disability, and (3) he suffered an adverse employment action because of his disability. *See id.*

"Ordinarily, in cases involving only indirect evidence of discrimination . . . , courts apply the *McDonnell Douglass* burden shifting framework to determine whether the adverse employment action was taken 'because of' the alleged disability." *Ramsey v. Moniz*, 75 F. Supp.

3d 29, 47 (D.D.C. 2014). However, as the D.C. Circuit has explained, if the employer has proffered a legitimate, non-discriminatory justification for the challenged action, the court need not decide whether the plaintiff has made out a *prima facie* showing of discrimination under the *McDonnell Douglas* framework. *See id.* at 48. Instead, the court need only assess whether the employee has "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee." *Id.* (quoting *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)).

Here, the Agency has proffered a non-discriminatory justification for terminating Mr. Jefferson: his "continuous and significant violations of the Agency's time and attendance policy." Def.'s Mot. at 14. Consistent with that claim, the Agency's termination notice to Mr. Jefferson indicated that he was being separated because his "time and attendance practices" had "not met the standards expected of an employee in the Federal Government." Def.'s Ex. A at 149–50. One of the Agency's principal findings in that regard was that, over a period of about three months, he inaccurately recorded approximately 29.5 hours on his timecards. *See id.* at 150. Nevertheless, Mr. Jefferson contests that finding. *See* Pl.'s Opp'n at 21–26. He argues that his purported time and attendance violations are a mere "coverup" for the Agency's true motivations: discrimination and/or retaliation. *Id.* at 21.

As evidence of the Agency's discriminatory animus, Mr. Jefferson points to several incidents in which his supervisors criticized and admonished him over work-related issues. *See id.* at 5–6. It is true that evidence of discrimination can include "statement[s] or written document[s] showing a discriminatory motive *on* [*their*] *face*." *Drasek*, 121 F. Supp. 3d at 161 (quoting *Bowden v. Clough*, 658 F. Supp. 2d 61, 87 n.19 (D.D.C. 2009)). However, the

statements and actions that Mr. Jefferson cites are not facially discriminatory. Viewed in the light most favorable to Mr. Jefferson, these "at most . . . indicate[] personal animosity" on the part of his supervisors, but not discriminatory animus. *Id.* For example, Mr. Jefferson makes much of the fact that, when Ms. Gottschall and Ms. Sanborn confronted him about his possession of an iPod at work, one of them allegedly asked him whether his iPod was a part of the software-related reasonable accommodation he had received. *See* Pl.'s SMF ¶ 14; Jefferson Decl. ¶ 16. But no reasonable jury could ascribe anti-disability animus to his supervisor based on that question alone. *Cf. Drasek*, 121 F. Supp. 3d at 161 (holding that an email from an employee criticizing the plaintiff's "ability to think," but not explicitly referencing the plaintiff's bipolar disorder, was not facially discriminatory).

Similarly, Ms. Sanborn's criticism of Mr. Jefferson's "use of verb tense and minor missed [*sic*] spellings" is not facially discriminatory. Pl.'s SMF ¶ 3. Although Mr. Jefferson claims that Ms. Sanborn "berated" him over his writing during an April 2016 meeting "despite being aware of [his] dyslexia-related accommodations," he does not adduce evidence from which a factfinder could reasonably infer that Ms. Sanborn harbored anti-dyslexia animus. *Id.* Ms. Sanborn testified that when she "was correcting [Mr. Jefferson's] spelling and grammar," she did not know that his accommodations were related to a learning disability. Def.'s Ex. A, Sanborn Dep. at 366, 378. Mr. Jefferson disputes this, arguing that he brought up his "reading comprehension reasonable accommodations" during the April 2016 meeting. Jefferson Decl. ¶ 8. But even assuming that Ms. Sanborn learned at this meeting that Mr. Jefferson had a learning disability, Mr. Jefferson's testimony suggests that Ms. Sanborn began correcting him even before that meeting, *see id.* ¶ 6, and he does not point to evidence that Ms. Sanborn continued berating him about his spelling and grammar after that meeting.

Mr. Jefferson's evidence that his performance objectives were "written against [his] disability" also falls short of raising a reasonable inference of discrimination. Pl.'s Ex. 9-1 at 1. He takes issue with a performance objective that his communications be "free of spelling & grammatical errors." *Id.* Certainly, an inference of discrimination could be raised if his supervisors knew that he had dyslexia yet insisted on imposing that objective. But the evidence overwhelmingly shows that this was not the case. First, Ms. Gottschall testified that she included that objective in error. *See* Pl.'s Ex. 8, Gottschall Dep. at 156. Second, according to a record of the Reasonable Accommodation meeting that took place on May 19, 2016, Ms. Gottschall "agreed" to modify that objective to state that Mr. Jefferson's communications could have "minimal errors until she reviews them." Pl.'s Ex. 8-5. Third, that modification was, in fact, adopted. *See* Def.'s Ex. A at 87 (changing the verbiage of the objective to "communications have minimal spelling and grammatical errors").

In any event, even if a reasonable inference could be made that Ms. Gottschall's or Ms. Sanborn's actions were tainted with discriminatory animus, neither of them was ultimately responsible for Mr. Jefferson's termination. Mr. Jefferson does not dispute that Ms. Horsley issued the recommendation and Mr. Rush took the final decision to terminate him. *See* Pl.'s Opp'n to SMF ¶¶ 58–59. He argues, however, that Ms. Gottschall and Ms. Sanborn "initiated the firing and wrote the firing memo" and that their "animus infected the Rush decisional process sufficiently for a jury to potentially hold [the Agency] liable." Pl.'s Opp'n at 6 & n.13. In so arguing, he invokes the "cat's paw" theory of liability,[4] under which "the discriminatory animus

[4] "The phrase derives from an Aesop fable, later put into verse by Jean de La Fontaine, in which a wily monkey flatters a naïve cat into pulling roasting chestnuts out of a roaring fire for their mutual satisfaction; the monkey, however, devours them fast, leaving the cat with a burnt paw and no chestnuts for its trouble." *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 271–72 (2d Cir. 2016) (citation modified).

of a subordinate who recommends an adverse employment decision is imputed to the selecting officer who relies on the subordinate's recommendation." *Klotzbach-Piper v. Nat'l R.R. Passenger Corp.*, No. CV 18-1702 (RC), 2021 WL 4033071, at *10 (D.D.C. Sept. 3, 2021) (quoting *Brandli v. Micrus Endovascular Corp.*, 209 F. Supp. 3d 356, 361 (D.D.C. 2016)). To prevail on this theory, a plaintiff must show that (1) the subordinate performed an act motivated by discriminatory animus, (2) the subordinate intended the act to cause an adverse employment action, and (3) that act was a cause of the adverse employment action. *See id.*

Mr. Jefferson's cat's paw argument is without merit. To start, Mr. Jefferson fails to substantiate his claim that Ms. Gottschall or Ms. Sanborn recommended his firing. Although Ms. Gottschall testified that she was asked to prepare Mr. Jefferson's termination notice, she noted that it was Ms. Horsley "who first suggested terminating Mr. Jefferson." Pl.'s Ex. 8, Gottschall Dep. at 293, 299. Mr. Jefferson counters that Mr. Chevere "admit[ted] Gottschall and Sanborn initiated the firing." Pl.'s SMF ¶ 18. However, a review of the portion of Mr. Chevere's testimony that Mr. Jefferson cites reveals that Mr. Chevere stated only that he "imagine[d]" that the termination decision "had been made between" Ms. Gottschall, Ms. Sanborn, and Ms. Horsley. Pl.'s Ex. 16, Chevere Dep. at 89–90.

And even if Mr. Jefferson could show that Ms. Gottschall or Ms. Sanborn recommended that he be terminated, the cat's paw theory would not help him. Because a but-for causation standard applies to discrimination claims under the Rehabilitation Act, Mr. Jefferson cannot prove cat's paw discrimination unless he demonstrates, for example, that his immediate supervisors discriminatorily criticized his spelling and grammar *so that* the Agency would terminate him, and that their actions were a but-for cause of Mr. Rush's ultimate decision to

terminate him.[5] *Cf. Klotzback-Piper*, 2021 WL 4033071, at *11 (observing that even if the plaintiff could show that a trainer "discriminatorily evaluated her so that Amtrak would not certify her, she [could not] demonstrate that [the trainer's] actions were a but-for . . . cause" of a foreman's decision denying her certification); *see also id.* at *10 ("Exactly how close a causal connection must be to satisfy the third element [of the cat's paw analysis] depends on the cause of action."). Mr. Jefferson adduces no evidence from which a trier of fact could rationally conclude that Mr. Rush would not have decided to fire him but for Mr. Jefferson's immediate supervisors' allegedly discriminatory actions.

In fact, the Agency puts forward substantial evidence that the real reason it terminated Mr. Jefferson was that he failed to meet its expectations regarding time and attendance, such as by "recording and receiving pay for time in which [he] was not at work." Def.'s Ex. A at 150. Mr. Jefferson fiercely disputes that accusation. *See* Pl.'s Opp'n at 21–26. He insists, for example, that Ms. Thomas made serious rounding errors in calculating the purported discrepancies between the hours he reported on his timecards and the hours reflected in his badge swipe logs. *See, e.g.*, *id.* at 25 (providing examples of alleged miscalculations, including the

[5] The Supreme Court has approved the application of the cat's paw theory under the Uniformed Services Employment and Reemployment Rights Act, a statute "very similar to Title VII." *Staub v. Proctor Hosp.*, 562 U.S. 411, 417 (2011). Accordingly, several circuits, including the D.C. Circuit, have adopted this theory in Title VII cases. *See Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 297 & n.1 (D.C. Cir. 2015); *Vasquez*, 835 F.3d at 272 (collecting cases). However, the D.C. Circuit has not addressed whether the cat's paw theory applies in Rehabilitation Act cases. At least one district court in another circuit has declined to extend this theory to the Rehabilitation Act context because, unlike Title VII cases, which allow for mixed-motive causation, the Rehabilitation Act requires stricter but-for causation. *See Natofsky v. City of New York*, No. 14 CIV. 5498 (NRB), 2017 WL 3670037, at *12 (S.D.N.Y. Aug. 8, 2017); *see also Zuro v. Town of Darien*, 432 F. Supp. 3d 116, 130 (D. Conn. 2020) (declining to decide whether the cat's paw theory applies in the Rehabilitation Act context). This Court need not reach this issue. As explained above, even if the cat's paw theory applies, Mr. Jefferson cannot show that his immediate supervisors' actions were a but-for cause of Mr. Rush's decision to terminate him.

improper docking of 45 minutes on February 3, 2016; 45 minutes on February 18, 2016; and 15 minutes on February 19, 2016). Furthermore, he presents evidence that on at least one occasion, the Agency failed to account for his use of a temporary badge. Although Ms. Thomas calculated that he falsely reported eight hours of work on February 23, 2016—given that his badge swipe log lacked entries for that day—Mr. Jefferson maintains that he used a temporary badge that day. *See* Pl.'s Opp'n at 24. As he points out, a memorandum from Ms. Gottschall notes Mr. Jefferson's presence at a meeting held on February 23. *See* Pl.'s Ex. 5 at 5.

Mr. Jefferson's evidence is sufficient for a reasonable factfinder to conclude that at least some of the Agency's calculations are incorrect. Nevertheless, such evidence is not enough to stave off summary judgment. "Once the employer has articulated a non-discriminatory explanation for its action . . . , the issue is not 'the correctness or desirability of [the] reasons offered…but whether the employer honestly believes [them].'" *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996). Thus, "to avoid summary judgment, [Mr. Jefferson] must adduce evidence from which a reasonable jury could find that [the Agency's] proffered reason 'is a lie,' in the sense that it is not an honestly held belief." *Dyer v. McCormick & Schmick's Seafood Restaurants, Inc.*, 264 F. Supp. 3d 208, 226 (D.D.C. 2017) (quoting *Aka*, 156 F.3d at 1288 n.3). "That said, in some circumstances, 'the fact that a proffered reason is objectively false may undermine an employer's professed honest belief in that reason.'" *Id.* (quoting *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005)). In other words, "a belief may be so unreasonable that a factfinder could suspect it was not honestly held." *Id.* at 227 (quoting *DeJesus v. WP Co. LLC*, 841 F.3d 527, 534 (D.C. Cir. 2016)). But here, Mr. Jefferson does not adduce evidence reasonably suggesting that the Agency knowingly lied about his time and attendance violations or that the purported violations are so "unreasonable," *id.* (quoting

*DeJesus*, 841 F.3d at 534), that a "trier of fact c[ould] reasonably infer from the falsity of the explanation" that the Agency was attempting to "cover up a discriminatory purpose," *id.* at 226–27 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000)).

On this latter point, consider, for example, the incident in which Ms. Gottschall admonished Mr. Jefferson for working irregular hours. According to Mr. Jefferson, on May 2, 2016, Ms. Gottschall reprimanded him for working two hours past his normal departure time on the Thursday of the preceding week and leaving two hours early the following day without informing her. Pl.'s SMF ¶ 12; *see also* Pl.'s Ex. 5 at 50–51. Mr. Jefferson emphasizes that he explained to Ms. Gottschall that he had to stay late to attend a mandatory class. *See* Pl.'s SMF ¶ 12. But he does not dispute that he failed to alert Ms. Gottschall of his intention to leave early the following day, despite her stated prohibition on employees leaving early without advance approval. *See* Pl.'s Ex. 5 at 5, 50.

Moreover, although Mr. Jefferson challenges Ms. Thomas's calculations, he effectively concedes that he inaccurately reported at least some of the hours at issue in his termination notice. For example, for the pay period beginning on April 4 and ending on April 15, 2016, Ms. Thomas concluded that Mr. Jefferson was not present at work for three of the 80 hours that he claimed on his timecard. *See* Pl.'s Ex. 5 at 39. In his statement of material facts, Mr. Jefferson argues that Ms. Thomas improperly discounted anywhere between one and fourteen minutes on each day of that pay period, adding up to 90 minutes total. *See* Pl.'s SMF ¶ 26.c. But even subtracting those 90 minutes from the three hours Ms. Thomas calculated, Mr. Jefferson would still have overreported the remaining 90 minutes.

As the examples above illustrate, Mr. Jefferson's evidence cannot wholly disturb the Agency's determination that his "time and attendance practices" fell below the "standards

expected" of its employees. Def.'s Ex. A at 149. At minimum, this means that such determination is not so "objectively false" that a trier of fact could reasonably infer, solely from its falsity, that the Agency did not genuinely believe its own justification for terminating Mr. Jefferson. *Dyer*, 264 F. Supp. 3d at 226 (quoting *George*, 407 F.3d at 415).

Mr. Jefferson makes a final attempt to cast doubt on the Agency's reason for his termination using comparator evidence. As the D.C. Circuit has recognized, by "show[ing] that similarly situated employees [without a plaintiff's protected characteristic] received more favorable treatment," a plaintiff can "discredit [the] employer's justification" for a challenged adverse action. *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115 (D.C. Cir. 2016) (quoting *Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 548 F.3d 137, 145 (D.C. Cir. 2008)). Mr. Jefferson regards Luke Parrott, a "white, non-disabled" employee, as his comparator. Pl.'s Opp'n at 6. Like Mr. Jefferson, Mr. Parrott worked under Ms. Gottschall and Ms. Sanborn, and at one point, Ms. Gottschall found discrepancies between Mr. Parrott's timecards and badge swipes. *Id.* at 34; Pl.'s Ex. 8, Gottschall Dep. at 94–96. Yet unlike Mr. Jefferson, Mr. Parrott was not fired. Pl.'s Opp'n at 34. Mr. Jefferson leaves out crucial details, however, that render Mr. Parrott an inadequate comparator. Most importantly, Ms. Gottschall testified that once she reported Mr. Parrott's records to EMR, EMR disagreed that there were discrepancies in the records, after which no disciplinary action against Mr. Parrott was taken. Pl.'s Ex. 8, Gottschall Dep. at 96. In contrast, no evidence here suggests that any supervisor disagreed with Ms. Thomas's calculations of Mr. Jefferson's timesheet discrepancies before he was terminated. Furthermore, as the Agency notes, Mr. Jefferson has not established that Mr. Parrott was, like him, a probationary employee, which he would need to do to show that he and Mr. Parrott were similarly situated. *See* Def.'s Reply at 12; *cf. McKenna v. Weinberger*, 729 F.2d 783, 789 (D.C.

Cir. 1984) (concluding that two "permanent employees" were "not similarly situated" to the plaintiff, a probationary employee).

In sum, the Court concludes that no reasonable jury could find that the Agency's belief that Mr. Jefferson's time and attendance practices were inadequate was not the real reason it decided to terminate him. Accordingly, the Court grants summary judgment to the Agency on Mr. Jefferson's disability discrimination claim.

### C. Retaliation

The Court reaches the same conclusion with respect to Mr. Jefferson's retaliation claim. The Rehabilitation Act "prohibits retaliation against an individual for exercising her rights under the Act." *Doak*, 798 F.3d at 1099. To establish a claim for retaliation, the plaintiff must show that (1) "he engaged in statutorily protected activity," (2) "he suffered a materially adverse action by h[is] employer," and (3) "a causal link connects the two." *Solomon v. Vilsack*, 763 F.3d 1, 14 (D.C. Cir. 2014). "Retaliation claims brought under the Rehabilitation Act are subject to the same standards as Rehabilitation Act discrimination claims—*i.e.,* to prove the 'causal connection' in a retaliation case brought under the Rehabilitation Act[,] the plaintiff must show 'that the adverse action would not have occurred but for the protected activity.'" *Drasek*, 121 F. Supp. 3d at 162 (quoting *Marshall v. Potter*, 634 F. Supp. 2d 66, 73 (D.D.C. 2009)). And as with Rehabilitation Act discrimination claims, once an employer "c[omes] forward with a legitimate, non-retaliatory justification for [its] actions," the *McDonnell Douglas* burden-shifting framework falls aways, and the sole question becomes whether there is enough evidence for a reasonable jury to discredit the employer's justification and find that the employer retaliated against the plaintiff. *Solomon*, 763 F.3d at 14.

"[T]he act of requesting in good faith a reasonable accommodation is a protected activity" under the Rehabilitation Act. *Id.* at 15. Courts have similarly found that "informal complaints [of disability discrimination] to management are considered protected activity under the Rehabilitation Act." *Volpe v. New York City Dep't of Educ.*, 195 F. Supp. 3d 582, 596 (S.D.N.Y. 2016) (citation omitted). Here, Mr. Jefferson argues that he engaged in statutorily protected activity when he lodged a discrimination grievance against Ms. Gottschall and Ms. Sanborn on May 10, 2016, and when he requested a 4/10 schedule as a reasonable accommodation for his obesity and diabetes during a meeting with the Reasonable Accommodation team on May 19, 2016. *See* Pl.'s Opp'n at 10, 16. He alleges that the "[c]lose temporal proximity" between his protected activity and the Agency's decision to terminate him—which was taken by June 2, 2016, at the latest—gives rise to an inference of retaliation and precludes summary judgment on this claim. *See id.* at 16.

The Court disagrees. "[A]lthough temporal proximity can indeed support an inference of causation for purposes of establishing a prima facie case of retaliation, once a defendant proffers a legitimate reason for its adverse action, temporal proximity standing alone is not sufficient to defeat the proffer and to support a finding of retaliation." *Husain v. Barsa*, No. CV 15-708 (RDM), 2021 WL 663206, at *14 (D.D.C. Feb. 19, 2021) (citation modified). For the reasons set forth above, Mr. Jefferson has failed to put forward sufficient evidence from which a reasonable trier of fact could infer that the Agency's belief that he committed time and attendance violations was not the real reason it terminated him. Indeed, the undisputed evidence shows that his supervisors began admonishing him about his time and attendance practices no later than March 2016, before he requested a 4/10 schedule as a reasonable accommodation or accused his supervisors of discrimination. *See, e.g.*, Pl.'s Ex. 14-3 at 1–2; *Clark Cnty. Sch. Dist. v. Breeden*,

532 U.S. 268, 272 (2001) ("[P]roceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatsoever of causality."); *Pinney v. Isaacman*, No. 19-CV-2259 (JMC), 2026 WL 622255, at *13-14 (D.D.C. Mar. 5, 2026) (relying on *Breeden* to hold that no reasonable jury could find that a supervisor's issuance of a performance improvement plan to an employee was retaliatory where the supervisor's underlying concerns predated the employee's protected activity). Accordingly, the Court finds that the Agency is entitled to summary judgment on Mr. Jefferson's retaliation claim.

## V. PLAINTIFF'S REQUEST FOR AN ORDER OF SPOLIATION

In his opposition brief, Mr. Jefferson indicates that he seeks an order of spoliation from the Court under Federal Rule of Civil Procedure 37(e). *See* Pl.'s Opp'n at 35–45. Rule 37(e) "governs a court's inquiry in deciding whether to impose sanctions for the failure to preserve" electronically stored information ("ESI"). *Borum v. Brentwood Vill., LLC*, 332 F.R.D. 38, 43 (D.D.C. 2019). "Under Rule 37(e), when '[ESI] that should have been preserved in the anticipation of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery,' a court may (1) 'order measures no greater than necessary to cure the prejudice,' or, only upon finding 'that the party acted with the intent to deprive another party of the information's use in the litigation,' (2) 'presume that the information was unfavorable to the party, instruct the jury that it may or must presume the information was unfavorable to the party, or dismiss the action or enter a default judgment.'" *Id.* (quoting Fed. R. Civ. P. 37(e)(1)–(2)). In this case, Mr. Jefferson alleges that the Agency failed to preserve the timesheets and badge swipes of Luke Parrott, his purported comparator. Pl.'s Opp'n at 6, 40. From this alleged loss, Mr. Jefferson seeks to have the Court presume that Mr.

Parrott's records were unfavorable to the Agency—specifically, that those records would have shown "disparate treatment disadvantaging Jefferson." *Id.* at 40.

The Court will not do so.[6] Under Rule 37(e)(2), an adverse inference based on the spoliation of evidence may be drawn only upon a finding that the spoliating party acted with the intent to deprive the opposing party of the evidence's use in litigation. *See* Fed. R. Civ. P. 37(e)(2). But Mr. Jefferson offers no evidence that the Agency acted with this requisite intent. He notes that the Agency's counsel was put on notice of Mr. Jefferson's need for Mr. Parrott's records as of 2018, which was within the Agency's "five-year non-destruction period" for such records. Pl.'s Opp'n at 40. But "[a] showing of negligence or even gross negligence will not do the trick" for sanctions under Rule 37(e)(2). *Borum*, 332 F.R.D. at 48 (quoting *Applebaum v. Target Corp.*, 831 F.3d 740, 745 (6th Cir. 2016)).

Furthermore, "even if [Mr. Jefferson] were entitled to an adverse inference, it would not permit [him] to defeat summary judgment." *von Muhlenbrock v. Billington*, 579 F. Supp. 2d 39, 45 (D.D.C. 2008). As noted, Mr. Jefferson regards Mr. Parrott as a comparator capable of showing disparate treatment because, at one point, Ms. Gottschall testified that she found discrepancies between Mr. Parrott's timecards and badge swipes, yet Mr. Parrott was not fired. Pl.'s Ex. 8, Gottschall Dep. at 94–96. But for the reasons noted above, Mr. Jefferson has not shown that Mr. Parrott is an adequate comparator or, consequently, that Mr. Parrott's records are material to Mr. Jefferson's discrimination and retaliation claims. Accordingly, the loss of those records cannot entitle him to defeat summary judgment on those claims.

[6] Because the Court denies Mr. Jefferson's request for a finding of spoliation, it also denies his motion in limine, *see* ECF No. 64, which requests identical relief.

## VI. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (ECF No. 60) is **GRANTED IN PART AND DENIED IN PART**, and Plaintiff's motion in limine (ECF No. 64) is **DENIED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: September 17, 2026

RUDOLPH CONTRERAS
United States District Judge